## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MARIA WOODS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:23-cv-02259-HLT** |
| **EDELMAN FINANCIAL ENGINES, LLC,** | |
| **Defendant.** | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Maria Woods sues her former employer Defendant Edelman Financial Engines, LLC, for sex- and race-based discrimination, hostile work environment, retaliation, and constructive discharge. Plaintiff is a Hispanic female. She claims that Defendant violated Title VII and § 1981 when it paid her less than white male employees, failed to promote or transfer her, retaliated against her for her compensation-based complaints, and constructively discharged her. Defendant moves for summary judgment. Doc. 33.

The Court grants Defendant's motion for summary judgment because no reasonable jury could find that: (1) Defendant's explanations for paying Plaintiff less based on experience, education, and geography are pretextual, (2) Defendant denied Plaintiff a promotion or a lateral transfer for discriminatory reasons, (3) Plaintiff's paychecks created a hostile work environment, (4) Plaintiff engaged in protected conduct when she complained about her pay, or (5) Plaintiff's resignation was actually an unlawful constructive discharge.

The overriding problem with Plaintiff's evidence is that it does not connect her pay, treatment, or complaints to her sex or race. Plaintiff has presented no evidence from which a reasonable jury could find Defendant discriminated against her based on her sex or race. Claims

under Title VII and § 1981 require this connection. Defendant is therefore entitled to summary judgment.

## I.   BACKGROUND[1]

### A.   Plaintiff's Background and Career with Defendant

Plaintiff is a Hispanic female who worked for Defendant between 2016 and 2022. Doc. 32 at 2-3. Plaintiff received consistently positive performance reviews, was promoted multiple times, and saw a substantial increase in her compensation. *Id.* Plaintiff quit in September 2022. *Id.* at 3.

Plaintiff has a 2009 college degree in sociology and communications. Doc. 33 at 20. She had not worked in the financial services industry before she began working for Defendant in August 2016. *Id.* Defendant initially hired Plaintiff as an Executive Administrative Assistant at an hourly rate of $28.85. Doc. 32 at 2. She performed a support function for Defendant's executive team. Doc. 33-1 at 8; *see* Doc. 33-2 at 32. Plaintiff received merit raises and performance bonuses for her work as an assistant in 2017, 2018, and 2019. Doc. 32 at 2.

Defendant promoted Plaintiff to "Senior Project Manager" in 2020. *Id.*; Doc. 33 at 12. The position was budgeted for a $77,000 salary. Doc. 33-1 at 120. But Defendant offered Plaintiff $92,000 to take the position (with eligibility for a 15% "target bonus") because Plaintiff had made more than $77,000 as an executive assistant due to overtime pay. Doc. 34-6 at 4-9.

Plaintiff continued to perform well. *See* Doc. 33 at 12-13. She received a merit raise and bonus in 2021. Doc. 32 at 2. And Defendant promoted Plaintiff to the position of "Senior Program Manager – Integrations" in October 2021. *Id.* Her annual salary in that role was $120,000, plus eligibility for a 15% target bonus. *Id.* Defendant offered Plaintiff the position to "backfill" for an

---

[1]   For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party.

individual named Brian Orme. Doc. 34-1 at 23-25; Doc. 34-19 at 2-4. Plaintiff was essentially Orme's replacement. Doc. 34-1 at 22; *see* Doc. 32 at 2.

Plaintiff received multiple bonuses in early 2022. Doc. 32-2. One of those was a "spot" bonus for which she had been recommended because of her effective work. *Id.*; Doc. 33-1 at 127.

Plaintiff's position was moved from Defendant's Wealth Planning team to the Corporate Support team around June 2022.[2] Doc. 32 at 2; Doc. 33-1 at 22-23. Plaintiff's position, title, job responsibilities, and pay stayed the same. *Id.*

Defendant never disciplined Plaintiff during her employment. Doc. 32 at 3; Doc. 33-1 at 34-35. She received positive performance reviews with overall ratings of "overachieved" and "achieved." Doc. 32 at 3.

Plaintiff understood that her former supervisor Sara Baker had "submitted" her in the spring of 2022 for promotion to a director-level position. Doc. 34-22 at 2. But Plaintiff claims that Patrick Garvey, one of her superiors, told her that she would not be promoted to a director level. Doc. 33-1 at 40-41; Doc. 34-14 at 9; Doc. 34-22 at 2. Garvey also told Plaintiff that she should not compare her salary to others' salaries. *See* Doc. 34-14 at 12-13. Plaintiff represents that Garvey's statement was not so broad and that he instead told her that she should not compare her salary to "other men's" salaries. Doc. *Id.* at 12. According to Plaintiff, Garvey then requested salary figures from another employee who was a female for comparison purposes. *Id.* at 14.

### B.    Compensation and Promotion of White Male Employees

Defendant hired Orme (whose position Plaintiff backfilled) in July 2019. Doc. 33-2 at 26. Orme is a white male. *Id.* at 8. His salary was $140,000. *Id.* at 26. He was making $143,500 when

---

[2]    The papers refer to these two groups in a few ways, e.g., Wealth Planning organization, Wealth Management, Corporate Operations group. They all appear to be referencing the same two groups. The Court uses "Wealth Planning team" and "Corporate Support team" for consistency.

he left Defendant's employ. *Id*. Orme had worked in the financial services industry for at least thirteen years when he was hired.[3] Doc. 32 at 2. He identified the position he held at TD Ameritrade before Defendant hired him as "program manager." Doc. 32-2 at 29.

Nick Robbie was senior project manager for Defendant. *Id*. at 27-28. Robbie is a white male. Doc. 34-2 at 6. Defendant hired Robbie in June 2021. Doc. 33-2 at 17. Robbie lived in Boston, had worked in the financial industry for TIAA since June 2016, held himself out as having experience in project management, and had a 2017 bachelor's degree in finance. *Id*. at 18-19, 31. Robbie's starting salary at Edelman was $125,000. *Id*. at 27.

Defendant hired Caleb Smith, a white male, in 2020 as Director of Corporate Development and Strategic Finance. *Id*. at 21-22; Doc. 33-5 at 3-5. Smith lived in the Boston area and had a 2015 bachelor's degree in accounting and financial management. Doc. 32-2 at 35. Smith also held a chartered financial analyst certificate. *Id*. When Defendant hired Smith, he had been working in the financial services industry for four years. *Id*. at 21-22, 35. Smith's starting salary was $165,000. *Id*. at 22, 26, 25.

Plaintiff's move from the Wealth Planning team to the Corporate Support team placed Plaintiff underneath Smith. Doc. 33-1 at 59-60. According to Plaintiff, some people seemed surprised that Plaintiff had been placed under Smith in the chain-of-command, rather than alongside him at the director level. Doc. 34-14 at 4, 9. Plaintiff expressed concerns about Smith's role as her new manager to Baker (a former manager of Plaintiff's) and Stephanie Albrecht and Tara Richards in human resources. Doc. 33-1 at 25-26.

---

[3]   There is some ambiguity in the record about Orme's experience. *Compare* Doc. 34-1 at 39-40 (noting 21 years of experience with only 12 years' worth of prior positions listed) *with* Doc. 32 at 2 (13 years). The parties stipulated in the pretrial order that Orme had thirteen years of experience. Doc. 32 at 2.

### C.     Plaintiff's Complaints about her Compensation

Plaintiff raised questions and concerns about her compensation several times during her tenure with Defendant.

#### 1.     Discussion with Patrick Garvey

As mentioned above, Garvey told Plaintiff that she would not be receiving a promotion to a director-level position. During that conversation Plaintiff asked Garvey about how "the complexity of [her] role and [her] salary compared to people still in the senior project manager role that . . . also reported to him." Doc. 34-14 at 11-12. Plaintiff indicated that "there [were] people who ma[d]e more money than [her]" but had less complex roles and that it "didn't make sense . . . why [she] was not receiving the same [compensation], if not more." *Id.* at 12. It was during this conversation that Garvey told Plaintiff not to compare her salary to "other men's." *Id.*

#### 2.     Discussion with Stephanie Albrecht

Plaintiff learned at some point that her salary as a senior program manager was less than Orme's had been. *E.g.*, *id.* at 13. Plaintiff communicated with Albrecht in human resources about her concerns.[4] Doc. 34-1 at 21. Plaintiff testified that she thinks she emphasized Orme's status as a white male and her status as a Hispanic female during the conversation:

> I believe I made mention that, you know, as a Latina female, not being able to—me backfilling the role of a white male, and he's getting paid more than me, and they're not paying me equally as that, that's where I was saying now it feels like it's because I'm a Latina woman, something to that effect; where, yes [Albrecht] was aware that—of the race and gender issues.

---

[4]     Plaintiff had this conversation some time before an August 2022 conversation with Richards. The record is otherwise unclear as to when Plaintiff's discussion with Albrecht occurred. Plaintiff couldn't recall when the conversation took place. Doc. 34-14 at 106.

Doc. 33-1 at 43. For her part, Albrecht characterized "the general tone" of her conversation with Plaintiff as reflecting Plaintiff's feeling that she was underpaid, dissatisfied with her compensation, and frustrated that her compensation had not been the same as Orme's. Doc. 34-1 at 67.

### 3.     Discussion with Tara Richards

Plaintiff contacted Richards, another human resources employee, on June 29, 2022, to discuss the salary associated with her position. Doc. 34-18 at 2-3. Plaintiff and Richards communicated by phone on August 18, 2022.[5] Doc. 34-3 at 26. Plaintiff recorded this conversation surreptitiously. *Id.* at 16.

Albrecht had told Richards at some point before the conversation that Plaintiff had concerns about her compensation. *See* Doc. 34-1 at 31. Plaintiff told Richards that Garvey had told her that she would not be promoted to director. Doc. 33-1 at 136. She also expressed concern that she was not being paid as much as Orme had been or as much as other senior managers. *Id*. Richards told Plaintiff that she was being compensated fairly based on the "market." *Id*. Plaintiff was also told that she would not be receiving a salary increase because Defendant had hiring and expense freezes and was making "cuts." *Id*. Plaintiff was told that there would not be any "off-cycle" adjustments to compensation and that changes would have to occur at the end of the year. *Id*. Plaintiff questions this explanation because Smith had received a bonus earlier in the spring and was subsequently promoted to "Senior Director of Corporate Strategy" on September 1, 2022. Doc. 34-1 at 50-52; Doc. 34-16 at 6.  Smith's promotion was accompanied by a raise. Doc. 34-4 at 16; Doc. 34-16 at 7.

---

[5]     When Plaintiff initially contacted Richards, she was preparing to leave on a nearly month-long sabbatical from July 5th through August 1st. Doc. 34-18 at 2-3. Plaintiff suggested Albrecht would be "free to grab time the week of" August 2nd for the meeting. Richards noted in her response that she had a vacation scheduled from August 2nd to August 11th and indicated that the meeting would be scheduled after her return. *Id.* at 2.

####     4.        **Discussion with Caleb Smith**

Plaintiff was reviewing budget items after her move to Wealth Planning. She discovered that Defendant had budgeted her position for $125,000 but was only paying her $120,000. Doc. 34-4 at 12-15. Plaintiff was frustrated and communicated with Smith about it. *Id.* Smith instructed her not to work on the budget any longer. *Id.* at 15. But Smith did not report Plaintiff's concerns to Defendant's human resources group. *See id*. Smith advised that the $125,000 budget included other items in addition to Plaintiff's salary. *Id.* at 14-15. Plaintiff challenges this explanation because the bonus she was eligible for, alone, would have exceeded $5,000. *See* Doc. 34 at 12.

Plaintiff discussed her compensation again with Smith during a phone call on or about September 7, 2022. Doc. 33-6. Plaintiff expressed frustration with Defendant's human resources department. *Id*. Plaintiff also assured Smith that she would be "vocal" about any "issues" she had. Doc. *Id*. Plaintiff did not tell Smith that she had been discriminated against, harassed, or retaliated against while working for Defendant. *Id*. Plaintiff recorded the call without Smith's knowledge. Doc. 34-4 at 17-18.

### D.        **Plaintiff's Resignation and Subsequent Employment**

Plaintiff received a job offer from another company on September 12, 2022. Doc. 32 at 3. She resigned from Defendant a week later. *Id*. The following timeline summarizes relevant events during that week in 2022:

- Monday, September 12: Plaintiff received a job offer from SelectQuote. *Id*.

- Tuesday, September 13: Plaintiff accepted SelectQuote's offer. *Id*.

- Wednesday, September 14: Plaintiff emailed Defendant's CFO Suzanne van Staveren. Plaintiff indicated that she had an interest in a lateral move back to the Wealth Planning team. Plaintiff also asked to meet to discuss her career with Defendant. Doc. 33-1 at 132-33.

- <u>Thursday, September 15</u>: Van Staveren responded that she would not support the lateral move back because Plaintiff had been in her current role for just a few months. *Id.* at 131-32. Van Staveren's explanation was not accurate. Doc. 34-17 at 9; Doc. 34-21 at 2-3. Plaintiff corrected her, noting that she had been in the role for nearly a year at that point. Doc. 34-21 at 3. Plaintiff also referenced her minority status. *Id.* Specifically, a portion of Plaintiff's email stated:

  > Interested in learning why I would not have your support especially in a role where I am extremely qualified and have leadership support in Wealth Planning. In my 6 year tenure here, I have consistently earned multiple 'overachieved' ratings on every performance review, from multiple managers, and my current work is all on track and in good standing to ensure we close on time and hit our key milestones.
  >
  > My interest in the internal opportunity came because as a minority woman in this industry, one of the aspects I have valued here at EFE is the company commitment to DE&I initiatives and "commitment to creating a diverse, equitable and inclusive environment". I have been a member of WIL since inception, and value EFE's commitment to help advance women in the workplace along with the various DE&I ERG groups that touts the support to allow minority talent to blossom here at EFE.
  >
  > Disappointing and unfortunate to have a valuable opportunity closed off despite all my achievements and qualifications.

  *Id.*

- <u>Thursday and/or Friday, September 15/16</u>: Van Staveren communicated with Richards about an appropriate response. *Id.* at 2.

- <u>Friday, September 16</u>: Van Staveren replied to Plaintiff by email. She acknowledged that she was wrong about how long Plaintiff had been in the role. She told Plaintiff that she was free to apply for any position she wished to. And she said that she would schedule time for them to connect to discuss Plaintiff's career path and other matters. Doc. 33-1 at 130-31. Plaintiff later testified that van Staveren's initial indication that she wouldn't support Plaintiff's lateral move was the reason Plaintiff resigned. Doc. 33-1 at 29-30; Doc. 34-14 at 7; 34-22 at 3.

- <u>Monday, September 19</u>: Plaintiff resigned, effective October 3, 2022. Doc. 32 at 3.

- <u>Friday, September 23</u>: Richards conducted Plaintiff's exit interview. Richards asked Plaintiff about her message to van Staveren and Plaintiff's reference to her membership in protected classes in that message. Richards asked Plaintiff multiple times if she felt that she had been discriminated against. Doc. 33-8. Plaintiff's responses were evasive. She refused to respond to these questions directly or to clarify statements made in her message to van Staveren. *Id.* But Plaintiff did challenge Richards's statement that Defendant took allegations of discrimination seriously, noting that she had "raised a number of issues and comments to people and nothing happened." *Id.* She also told Richards that she felt Defendant could work on its "inclusivity." Plaintiff recorded her exit interview with Richards without informing her that she was doing so or seeking Richards's permission. Doc. 33-1 at 49-50.

## II.     STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    ANALYSIS

Plaintiff seeks recovery under Title VII and § 1981 for sex- and race-based discrimination, hostile work environment, retaliation, and constructive discharge. First, Plaintiff alleges that Defendant discriminated against her by paying her less than white male colleagues, failing to promote her, and denying her lateral-transfer request. Second, Plaintiff claims that Defendant subjected her to a hostile work environment each time it paid her less than similarly situated white males. Third, she alleges Defendant retaliated against her for her wage-based complaints. And fourth, Plaintiff claims that Defendant constructively discharged her by making it clear that she would not be promoted or satisfactorily paid.

A.       **Sex- and Race-Based Discrimination**

Plaintiff claims that Defendant unlawfully discriminated against her by paying her less than white male colleagues who had similar or identical positions, by not promoting her to director, and by denying her request to transfer back to the Wealth Planning team.

Discrimination claims premised on allegations of disparate treatment and based on indirect or circumstantial evidence are subject to the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This framework outlines a three-stage process for the summary judgment analysis. In the first stage, a plaintiff is required to make out a prima facie case of discrimination against the defendant. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). This initial burden is not particularly onerous. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In general, a plaintiff states a prima facie case by showing she is a member of one or more groups protected under Title VII and § 1981 and that an adverse employment action was taken against her under circumstances giving rise to an inference of discrimination. *Salemi v. Colo. Pub. Employee's Retirement Assoc.*, 747 F. App'x 675, 694 (10th Cir. 2018). At the second stage, the burden shifts to the defendant to offer a lawful, nondiscriminatory justification for the employment decision at issue. *Bekkem*, 915 F.3d at 1267. A defendant's burden at this stage is simply one of production, not persuasion. *Burdine*, 450 U.S. at 254-55. At the third stage, the burden shifts back to the plaintiff to show that the defendant's explanation is not to be believed and is just pretextual. *Bekkem*, 915 F.3d at 1267.

1.       **Wage Discrimination**

Much of Plaintiff's case against Defendant revolves around her salary. These are the ways that Plaintiff claims Defendant engaged in sex- and race-based wage discrimination:

- Defendant did not pay her the salary it had budgeted for her role while she was a senior project manager.

- Defendant paid Plaintiff significantly less for the same work as Orme.

- Plaintiff's salary as a senior program manager was $5,000 less than Robbie's.

- Defendant has underpaid other female employees.

- Defendant's human resources group gave her an incorrect explanation on whether she was raise-eligible.

Plaintiff establishes a prima facie wage discrimination case by showing that she occupied a job similar to that of higher paid male and/or white employees. *Salemi*, 747 F. App'x at 693. Plaintiff has satisfied this burden. She offers evidence to the effect that she and Orme had the same job and that she and Robbie had similar jobs, Orme and Robbie were paid more, and Orme and Robbie are white males.[6]

Defendant offers legitimate and lawful explanations for the pay disparities. Orme had more experience working in the financial services industry than Plaintiff. Orme had at least thirteen years. Plaintiff had five, including her years as an executive assistant. Plaintiff and Robbie had worked in the financial services industry for a similar number of years. But Robbie had a bachelor's degree in finance. Robbie also lived in a more expensive market than Plaintiff. Defendant considers geography when setting compensation levels.

The burden shifts back to Plaintiff to show evidence of pretext. Plaintiff contends that the following evidence shows that Defendant's proffered reasons for the pay differences are pretextual: (1) Defendant pays some women less than men, (2) Garvey told her not to compare her salary to others in the company, (3) Plaintiff was not paid the maximum budgeted salary for the

---

[6] Plaintiff's evidence that she was not paid the maximum amount of her budgeted salary when she replaced Orme does not itself support her prima facie case. Nor does the "statistical" evidence Plaintiff offers that Defendant paid women less than men. And Plaintiff's claim that the human resources group gave her an incorrect explanation why she was not raise-eligible is a more appropriate argument for pretext.

position she occupied, (4) Orme lacked "integration"-related experience (which was relevant to the position), and (5) Orme was bad at his job and she was effective.[7] Plaintiff's evidence is largely atmospheric and has little legal significance. It does virtually nothing to call Defendant's lawful explanations into question when considered individually and collectively.

First, the "statistical" evidence Plaintiff cites is not statistical at all; it is selective anecdotal evidence that some women who work for Defendant make less than some men who work for Defendant. But this evidence neither considers nor rules out lawful reasons that might exist for those selectively identified disparities. It certainly does not support an inference that Defendant discriminated against Plaintiff because she was a woman and that its explanation for paying her less was incredible.

Second, Garvey's comment about comparing her salary to "other men's" does not suggest that Defendant's reasons for paying her less are untrue.

Third, the potentially inaccurate explanations Plaintiff received from Smith and Richards about why her salary was lower than the amount budgeted for her position and why she would not be able to receive an "off-cycle" raise do not undermine the veracity of Defendant's non-discriminatory explanations for setting Plaintiff's salary where it did.

Fourth, Orme's lack of "integration"-specific experience is not evidence of pretext. That Plaintiff would have given different weight to Orme's experience than Defendant does not mean that Defendant's explanation was cover for discrimination. *See generally Waris v. Heartland Home Healthcare Servs., Inc.*, 365 F. App'x 402, 405 (3d Cir. 2010) (no pretext in failure to hire

---

[7]    It is unclear whether the incorrect explanation from Richards that Plaintiff received about the availability of a raise is another claim of wage discrimination or is just a pretext argument. If treated as a separate wage discrimination claim, it fails at the first stage of the *McDonnell Douglas* analysis: Plaintiff being told she wouldn't be getting a raise for inaccurate reasons is not evidence that someone with a similar job outside her protected categories was being paid more than her. The Court thus considers these facts in connection with its pretext analysis.

case where plaintiff had more experience than the hired person but the hired person's relevant experience was more recent).

Fifth, Orme's alleged incompetence does not call into question his initial salary. Plaintiff replaced him. He did not continue working in the same position as Plaintiff, being paid more for lower-quality work. The Court finds "no reasonable jury could [conclude Defendant] didn't really believe its proffered reasons" for paying Plaintiff less "and thus may have been pursuing a hidden discriminatory agenda." *Ford v. Jackson Nat'l Life Ins. Co*, 45 F.4th 1202, 1221 (10th Cir. 2022) (internal quotation marks omitted).

### 2.    Failure to Promote or Transfer

Plaintiff bases her failure-to-promote/transfer claim on Defendant's decision not to elevate her to director and on van Staveren's statement that she would not support Plaintiff's lateral move to another of Defendant's groups. Plaintiff does not state a prima facie claim under either theory.[8]

With respect to Plaintiff's promotion-to-director argument, there is no record evidence describing the position Plaintiff actually sought, its qualifications and duties, or what is meant by Plaintiff's statement that Baker "submitted" her for such a position. To the extent Plaintiff is describing a position identical to Smith's director-level role before his promotion to Senior Director of Corporate Development and Strategic Finance, Plaintiff has not met her burden to show

---

[8]    The prima facie elements of a failure-to-promote claim are flexible, and the Tenth Circuit has articulated various iterations of the standard. *Mar v. City of Wichita, Kan.*, 2023 WL 6232410, at *2 n.4 (10th Cir. 2023). The parties disagree on the precise formulation of the prima facie standard. But they do agree Plaintiff must show she was qualified for position for which she sought to be promoted. The parties also agree that Plaintiff's membership in a protected group and denial of a sought-after promotion are elements. The point of disagreement is whether a formal "application" for the position was required. The Court's own research suggests that the "requirement" of an application may depend on the circumstances of a given case. *See, e.g.*, *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251 (10th Cir. 1992) ("Employment discrimination law does not require that a plaintiff formally apply for the job in question. Rather, the law requires either that the employer be on specific notice that the plaintiff seeks employment or, where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job.").

she was qualified for that role. Plaintiff has not come forward with evidence that shows what the qualifications for the position she was denied were and how she satisfied those qualifications. Plaintiff's failure to meet this burden means that Plaintiff has not stated a prima facie failure to promote claim. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1136-37 (10th Cir. 2004) (affirming summary judgment on failure-to-promote claims where plaintiff failed to prove the existence of a position employer was seeking to fill, the qualification criteria for the position, and how plaintiff satisfied those criteria).

Plaintiff also fails to state a prima facie case with respect to her requested lateral transfer.[9] Defendant did not actually deny Plaintiff's request for a transfer or discourage it. Plaintiff bases her claim of discrimination on van Staveren's statement that she would not support Plaintiff's request and her inaccurate justification for her decision – that Plaintiff had only been in her current role for a brief time. Plaintiff explained to van Staveren that she was mistaken about her tenure in the role. Van Staveren then checked with human resources and learned that Plaintiff was correct. Van Staveren acknowledged the error and told Plaintiff that she was free to apply for whatever position she wanted to. Ultimately, van Staveren did not deny Plaintiff's request or discourage her from seeking a transfer. To the contrary, the record suggests that van Staveren encouraged Plaintiff to seek a different position within Defendant's company. Plaintiff has not met her burden to show that an adverse employment action was taken against her under circumstances giving rise to an inference of discrimination.

---

[9]     Defendant characterizes Plaintiff's request to move back to Defendant's Wealth Planning team as a request for a "lateral" transfer. Courts in this district, following the Tenth Circuit's reasoning in *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527 (10th Cir. 1998), have previously held that denial of a lateral transfer is not ordinarily an "adverse employment action." *See, e.g.*, *Redmond v. Mirror, Inc.*, 2017 WL 3873730, at *8 (D. Kan. 2017). *Sanchez* was recently overruled by the Supreme Court in *Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967 (2024). *Muldrow* concludes that in a Title VII case, there's no requirement that an adverse employment action result in "significant" harm. 144 S. Ct. at 976-77. The Supreme Court's holding in *Muldrow* undermines the reasoning in *Sanchez* and its progeny behind characterizing employment actions involving "lateral" moves as not adverse.

### B.      Hostile Work Environment

Title VII and § 1981 protect employees from hostile work environments. Hostile work environments are those so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (cleaned up). Plaintiff presents her hostile work environment claim as a reformulation of her wage discrimination claim.[10] As discussed above, Plaintiff fails to support her wage discrimination claim with sufficient evidence of discrimination. Plaintiff's hostile work environment claim thus falls with her wage discrimination claim.

Applying the standard for a hostile work environment claim does not help Plaintiff. A plaintiff must "show that the environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (internal quotation marks and citation omitted). A court must evaluate the totality of the circumstances and "consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically

---

[10]      The Court is skeptical of Plaintiff's attempt to repackage her wage discrimination claim as a hostile work environment claim. Discrete claims like wage discrimination are "different in kind" from hostile work environment claims. *Morgan*, 536 U.S. at 114-16. A hostile work environment is one in which the workplace is so "permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 116 (cleaned up).

Discrete discriminatory conduct that is actionable in its own right seems likely to have downstream negative effects on a plaintiff's work environment. A hostile work environment requires more than identifiable negative consequences. It requires that the environment be so saturated with discrimination that the terms of employment are altered. The Court therefore doubts that all claims involving discrete discrimination could be reworked as hostile work environment claims whenever that discrete conduct has downstream adverse consequences. *Cf. Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 634-36 (2007) (reasoning that paychecks reflecting discriminatory pay-setting decisions for individual employees issued under facially nondiscriminatory and neutrally applied payment systems are the adverse effects of discrimination; they are not themselves discriminatory acts), *abrogated by* 42 U.S.C. § 2000e-5.

The Court notes this issue but does not reach or resolve it. Even accepting that Plaintiff can re-work her wage discrimination as a harassment claim, it still fails for the same reasons her wage discrimination claim fails. Hostile work environment claims still require <u>evidence of discriminatory conduct</u>. Plaintiff hasn't come forward with anything more than unsubstantiated supposition and innuendo.

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (internal quotation marks and citation omitted). Plaintiff subjectively may have felt that she was being discriminated against every time she received a paycheck that was lower than she believed it should be. But objectively this does not create a hostile or abusive environment. Plaintiff has no evidence of disparaging or threatening words, offensive conduct, or other actions that are the hallmarks of a hostile work environment. Receiving an unsatisfactory paycheck simply does not fit the mold of discriminatory treatment so severe that the conditions of Plaintiff's employment were altered. *Cf. Donnelly v. Acad. P'ships LLC*, 2023 WL 4033949, at *18 (N.D. Tex. 2023). Summary judgment to Defendant is warranted.

### C.    Retaliation

Plaintiff claims Defendant retaliated against her for complaining about her salary. The burden-shifting framework in *McDonnell Douglas* again applies. *Bekkem*, 915 F.3d at 1267. Plaintiff is thus required to show for her prima facie case (1) she "engaged in protected opposition to discrimination," (2) "a reasonable employee would have found the [action] challenged [as retaliatory] materially adverse," and (3) the protected activity was causally connected to the challenged adverse action. *Id*. (internal quotation marks and citation omitted). The critical question here is whether Plaintiff engaged in protected opposition to unlawful discrimination. The record indicates that Plaintiff complained about her pay to Albrecht, Richards, Smith, and Garvey. The disagreement is whether Plaintiff connected her complaints to her sex or race. No reasonable juror could find that she did.

Plaintiff argues that she raised sex and race in these ways: (1) Plaintiff believes that some mention was made of the fact that white men were being paid more than she was when she

complained to Albrecht; (2) Plaintiff mentioned to Richards that Orme was a man during their discussion about pay; (3) Plaintiff asked Garvey why she was being paid less than other project managers who made more but had less complex positions; and (4) Plaintiff questioned Smith about why she was not being paid the budgeted amount for her position.

Plaintiff's evidence is not compelling. Employee complaints should communicate that they implicate unlawful discriminatory conduct to qualify as protected opposition. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). The employer must know that the employee has engaged in protected opposition. *Id.* No "magic words" are required. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). But "the expression of a desire for personal advancement or for the enhancement of employment opportunities by a woman or member of a minority group does not invariably translate into a finding that that particular individual has opposed an employment practice believed to be unlawful under Title VII." *Gallagher v. Kleinwort Benson Gov't Sec., Inc.*, 698 F. Supp. 1401, 1406-07 (N.D. Ill. 1988). Generic complaints about unequal pay unaccompanied by some expression of concern about unlawful discrimination are not enough to show protected opposition. *Id.*

Plaintiff is required to have articulated in some fashion her belief that her lower pay was because of her sex or race in order to have been engaged in protected opposition. *Cf. Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 386 (10th Cir. 1984) (discharged plaintiff was engaged in protected opposition to discrimination when she attached a copy of the Equal Pay Act to a memo requesting a raise). None of Plaintiff's complaints about her salary refer to unlawful discrimination. Even with the benefit of all reasonable factual inferences favorable to her, neither Plaintiff's hand-waiving insistence that Albrecht was "aware . . . of the racial and gender issues" nor her uncorroborated belief that she <u>may</u> have referred to her race or sex during their conversion

would give a reasonable jury enough to conclude that Plaintiff had in fact complained of unlawful wage discrimination to Albrecht.

Plaintiff's complaints to Smith, Garvey, and Richards are likewise inadequate. Plaintiff's complaints fail to connect her sex or her race to her concerns about her compensation level. Indeed, even when the complaints are considered cumulatively rather than separately, there is simply no indication from the Court's review of the record that a reasonable jury could conclude that her statements signaled to Defendant that Plaintiff was complaining about race- or sex-based discrimination. At best Plaintiff expressed generic grievances about her pay and her job-title. Plaintiff's sex and race do not automatically transform generic grievances into protected opposition to unlawful discrimination. *See Gallagher*, 698 F. Supp. at 1406-07. Plaintiff has not stated a prima facie case of retaliation.[11] Summary judgment on her retaliation claim is warranted.[12]

### D.     Constructive Discharge

Constructive discharge claims have two elements. First, a plaintiff must prove that an employer's discriminatory conduct toward her was so severe that "a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016). Second, a plaintiff must show that she actually resigned. *Id.*

---

[11]   Plaintiff does not base her retaliation claim on her email response to van Staveren. Nor could she. Even if Plaintiff's reference to Defendant's commitment to diversity was understood as protected opposition (it is not), Plaintiff cannot identify any adverse action Defendant took against her afterward. Plaintiff had already made the decision to resign by the time she sent her email in response. Plaintiff had already accepted another job, and she testified that her final decision to resign was due to van Staveren's lack of support. Plaintiff does not identify anything Defendant did after this email that would have been adverse.

[12]   The Court questions whether Plaintiff has even <u>alleged</u> the second and third elements of a retaliation claim. It's unclear from the pretrial order and Plaintiff's summary judgment brief what adverse action Plaintiff argues Defendant took in response to her complaints. Because the Court concludes that the first element of Plaintiff's prima facie claim has not been satisfied, it need not consider Defendant's other arguments raised in the reply.

Plaintiff claims that her resignation was tantamount to a termination because her working conditions at Defendant's company became intolerable. She again points to her pay and Defendant's decision not to promote her to director. Plaintiff operates from essentially the same core set of facts that she uses to support her wage discrimination and failure-to-promote claims, in effect hitching her constructive discharge claim to those claims. Plaintiff's failure to carry her burden on those claims means that she has failed to sufficiently show Defendant discriminated against her.

And – as with Plaintiff's hostile work environment claim – Plaintiff fares no better applying the legal standard for constructive discharge. Like hostile work environment, constructive discharge uses an objective standard. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015). "[T]he plaintiff's subjective views of the situation are irrelevant." *Id.* (internal quotation and citation omitted). Further, a plaintiff's burden is substantial. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007). The fact that a plaintiff can show events that would meet the definition of an adverse employment action is not sufficient in and of itself to show constructive discharge. *Id.* Nor is the question whether the employee resigned because of the employer's actions. *Id.* Rather, the issue is "whether the employee had any other reasonable choice but to resign in light of those actions." *Id.* at 806 (internal quotation and citation omitted). Plaintiff has come nowhere near meeting this standard. And Plaintiff's own declaration cuts against a determination that she had no choice but to resign; Plaintiff stated that she would have reneged on her acceptance of other employment had van Staveren been supportive of her transfer. This suggests that her working environment was not so objectively abusive as to give her no choice but to resign. No reasonable jury could find otherwise. Summary judgment to Defendant on Plaintiff's constructive discharge claim is therefore appropriate.

THE COURT THEREFORE ORDERS that Defendant's motion for summary judgment

(Doc. 33) is GRANTED. The case is closed.

IT IS SO ORDERED.

Dated: August 26, 2024                              /s/ *Holly L. Teeter*
                                                    HOLLY L. TEETER
                                                    UNITED STATES DISTRICT JUDGE